

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 20, 2024

**VIA ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Kevin Taylor,* 23 Cr. 285 (LJL); 18 Cr. 586-01 (ALC)

Dear Judge Liman:

    The defendant in this case, Kevin Taylor, is scheduled to be sentenced on February 27, 2024, having pled guilty to possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1).  For the reasons explained below, the Government submits that a sentence at the upper end of the United States Sentencing Guidelines range of 46 to 57 months' imprisonment is warranted in this case.

    I.    **Offense Conduct**

    In the early evening of April 27, 2023, a 911 caller (the "911 Caller") reported that an individual, later identified as the defendant, was brandishing a firearm, acting "really erratic," and screaming that he had recently been released from custody.  The 911 Caller described the individual as slim, approximately 28 years old, wearing jeans and a black coat with red stitching, emblazoned with the letter "B" on the back. (Presentence Investigation Report ("PSR") ¶ 9-10). The 911 Caller further relayed that the individual was at that time traveling down Van Nest Avenue, from Taylor Avenue toward Melville Street, in the Bronx, New York.  In response to the report from the 911 Caller, NYPD officers canvassed the vicinity of Van Nest Avenue and Melville Street, with negative results for the defendant.

    About two hours later, the 911 Caller reported that the individual whom the caller described earlier to law enforcement had returned, specifically to the vicinity of Morris Park Avenue and Taylor Avenue in the Bronx, New York. (PSR ¶ 13).  In addition to the aforementioned description, the 911 Caller offered that the defendant was approximately 5'10" or 5'11," sporting a close-shave haircut, and going by "Killer Kev" or "Killer Ken." (*Id.* ¶ 14).  The caller noted that the defendant appeared to be menacing a woman ("Femlae-1") by waving a gun in her face. (*Id.* ¶15).

    Law enforcement officers reported to the intersection of Morris Park Avenue and White Plains Road, in the Bronx. There, they observed the defendant wearing a black jacket with the letter "B" stitched onto the back and otherwise matching the description of the individual provided

by the 911 Caller. (PSR ¶ 17). When officers approached the defendant, he initially lifted the left side of his shirt to indicate that he had no weapon, while keeping the right side of his shirt tucked into his waistband. (PSR ¶ 18). The defendant then stated, "I'm out of here," before he took off running, with officers in pursuit. After unsuccessfully attempting to enter a locked gate near 610 Van Nest Avenue, in the Bronx, New York, the defendant was placed under arrest and a firearm was recovered from his right hand. (*Id.* ¶ 19). In response to an officer's observation that the firearm was missing a clip, the defendant gestured down the block, stating, "The clip right there. I threw it over that shit." (PSR ¶ 21). Officers then located a firearm magazine, loaded with ten rounds of .40 caliber ammunition, beneath a red Toyota sedan directly in the footpath of the defendant. (*Id.*).

At the time of his arrest, the defendant was not one year into federal supervised release, following a 2021 conviction in this District for possessing a firearm in connection with a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i). *See* 18 Cr. 586 (ALC).

## II. Procedural History

On June 8, 2023, an Indictment was filed in the Southern District of New York (the "Indictment"), charging the defendant with one count of possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1). On November 14, 2023, the defendant pleaded guilty to Count One of the Indictment, after the Government furnished a *Pimentel* letter setting forth a Guidelines range of 46 to 57 months' imprisonment, based on an offense level of 17 and a criminal history category of V. During the same proceeding, the defendant also admitted to Specification 5 of the amended violation report dated June 27, 2023, in *United States v. Taylor*, 18 Crim. 586 (ALC).[1]

On February 8, 2024, the Probation Department issued its PSR for Kevin Taylor. Consistent with the *Pimentel* letter, the report calculated an applicable Guidelines range of 46 to 57 months' imprisonment (the "Guidelines Range"), based on an offense level of 17 and a criminal history category of V. (PSR ¶ 176). Probation recommends a sentence of 46 months' imprisonment. For the reasons discussed below, the Government believes that a sentence at the upper end of the Guidelines Range of 46 to 57 months' imprisonment is appropriate in this case.

## III. Discussion

### 1. Applicable Law

---

[1] Based on the same conduct underlying the instant case, Specification 5 of the violation report alleged that on or about April 27, 2023, the defendant committed a federal crime, namely being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Specification 5 constitutes a Grade A violation, mandating revocation of supervised release.

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence at the Upper End of the Guidelines Range Is Sufficient and Not Greater Than Necessary

A sentence at the upper end of the Guidelines Range of 46 to 57 months' imprisonment is sufficient and not greater than necessary, to reflect the seriousness of the instant offense, to provide just punishment, to promote respect for the law, to protect the public, and to afford adequate deterrence of future criminal conduct. *See* 18 U.S.C. § 3553(a)(1)-(2)(C).

*First*, a sentence within the Guidelines Range adequately reflects the seriousness of the instant offense and is necessary to provide just punishment. Twice in one evening, the defendant—reported to be acting erratically and broadcasting his recent release from federal custody—brandished a loaded firearm on a New York City street. Worse, on the second occasion, the defendant was observed waving that loaded gun *in Female-1's face*. Whether Female-1 was a total stranger, an intimate partner, or something in between, the defendant's conduct was equal parts terrifying and dangerous. Adding yet another element of recklessness, the defendant took

off running with a loaded gun after officers attempted to question him. To be sure, the defendant discarded the magazine—loaded with ten rounds—prior to being apprehended, but it takes little imagination to conceive of the grave harm that the defendant could have inflicted on himself or the officers had he been tackled before managing to toss the clip. A sentence at the upper end of the Guidelines Range appropriately reflects the seriousness of the defendant's conduct, including the unacceptable risk he created for Female-1, law enforcement officers, and the public.

*Second*, a sentence within the Stipulated Guidelines Range is necessary to specifically deter the defendant, promote respect for the law, and adequately protect the public from the defendant's consistently dangerous conduct. The defendant's arrest for the instant offense represents his *ninth* criminal conviction. (PSR at p. 35). His criminal history includes three prior firearms offenses: (1) In 2012, the defendant was arrested in possession of a loaded semi-automatic handgun within 1,000 feet of a school (PSR ¶ 46); (2) In 2014, the defendant was arrested in possession of a loaded revolver and marijuana (PSR ¶ 38); and (3) In 2018, the defendant was arrested in connection with a home-invasion robbery that resulted in a victim being shot in the leg. (PSR ¶ 67).

By themselves, the gun-related offenses demonstrate the defendant's disregard for the law, the danger he poses to the public, and the need for a significant incarceratory sentence. But the defendant's criminal history is replete with additional offenses—including escape and bail jumping—that leave no doubt as to his persistent dangerousness and risk of recidivism.[2] Making matters worse, he continues to offend even while incarcerated. As early as 2013, the defendant attempted to introduce a razor into Riker's Island, where he was being processed for entry. (PSR ¶ 49). And during his five-year term of incarceration for his previous federal conviction, the defendant racked up seven disciplinary infractions, including two for assault. (PSR ¶ 69). In that time, he availed himself of *zero* prison programming, neither completing any educational courses nor accepting any work assignments. (PSR ¶ 72).[3] Finally, in the eight months he has been incarcerated for the instant offense, the defendant has already collected four disciplinary infractions, including for threatening bodily harm. (PSR ¶ 5).

Pointing to programming he has pursued through the Osborne Association, the defendant maintains that at the time of his arrest for the instant offense, he was on the path to becoming a law-abiding citizen. (Taylor Sent'g Mem. at 5). While the defendant's efforts at rehabilitation may be sincere, he offers the Court no assurance that the same stressors that precipitated the instant offense will not revisit him and cause him to reoffend. Indeed, the defendant has a clear record of abusing the Court's trust, even as the Probation Office has sought to assist his community reintegration. Not eight months into his term of supervised release following federal custody, the defendant committed the instant offense. But his abuse of the court's trust began even earlier. In June 2022, while completing his term of federal incarceration at a residential reentry center ("RRC"), the defendant tested positive for PCP. (PSR ¶ 148). Then, on November 18, 2022, just two months after leaving the RRC, the defendant tested positive for marijuana. He tested positive again for marijuana in February 2023. Around that time, the defendant consistently failed to report

---

[2] Respectfully, the Government submits that Probation significantly understates things in stating that the defendant "*may* be a risk to the community." (PSR at p. 36).

[3] The defendant was incarcerated well before the COVID-19 pandemic disrupted prison programming.

for drug testing. These early infractions undermine Probation's description of the defendant as "initially . . . in compliance" with the terms of supervised release. (PSR at p. 35). In reality, he violated the terms of his supervised release early and often.

Finally, there is no question that the defendant's formative years were marked by tragedy and turbulence that no child should endure. (Taylor Sent'g Mem. Ex. A). In recent years, he appears only to have drifted further from family members (*compare* PSR ¶ 109, 116 *with* Taylor Sent'g Mem. Ex. B at 18), regrettably losing the sort of support that might give the Court confidence in the defendant's prospects for rehabilitation. Of course a sentence at the upper end of the Guidelines Range cannot guarantee that the defendant will not re-engage in criminal activity and place others at risk. But it would at least promise the public a reprieve from Taylor's dangerous behavior and signal to the defendant and other convicted felons that possessing a firearm—particularly for the purpose of threatening others—will be met with swift and serious punishment.

### IV.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence at the upper end of the Guidelines range of 46 to 57 months' imprisonment.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____
Marguerite B. Colson
Assistant United States Attorney
(212) 637-2587